## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-152 (CKK)** |
| **v.** | : | |
| | : | |
| **SANDRA LEE HODGES,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Sandra Lee Hodges has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct in a Capitol Building or Grounds) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four).  For the reasons set forth herein, the government requests that this Court sentence Hodges to 3 months' incarceration on Count Three and 36 months' probation on Count Four.  The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant Sandra Lee Hodges, a 62-year old retired clinical researcher and Air Force veteran,  participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count,

threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Hodges pleaded guilty to violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by the defendant's (1) presence and encouragement of fellow rioters during the melee and fall of the police line on the West Front; (2) decision to enter the Capitol Building via the Senate Wing Door at 2:53 p.m., five minutes after its second breach that day; (3) entry into two sensitive spaces—a Senator's hideaway office and a conference room reserved for Senators' spouses, where she banged on the table and yelled "Our House"; (4) the total length of time—40 minutes—she spent in the Capitol Building before being escorted out by police; (5) false statements to the FBI; and (6) obstruction of justice in destroying relevant evidence.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Hodges' crimes support a sentence of three months' incarceration and 36 months' probation with 60 hours of community service in this case.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 22 (Statement of Offense or "SOO"), ¶¶ 1–7.

### Defendant Hodges' Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Sandra Lee Hodges drove from her home in Hertford, North Carolina to Washington, DC.  SOO ¶ 8.  According to Hodges, on her drive north, she stopped in Virginia Beach to pick up an unidentified female friend that she had met online a few days prior.[2]  Hodges (and, according to Hodges, her friend) stayed overnight at the Mandarin Oriental Hotel in Washington, DC under a reservation she made under her own name from January 5 through 7, 2021.  *See id.*

On January 6, 2021, Hodges joined the crowd massing in the West Plaza of the Capitol grounds by, at latest, approximately 2:12 p.m.[3]  She wore a red hat with "Trump 2020 Keeping America Great" in black and white writing, glasses, a blue puffer jacket over a white sweater, and blue jeans.  *See* SOO ¶ 9; Image 1 below.  She also carried a black backpack.  *Id.*

---

[2] Hodges' reported interactions with this individual are discussed further below in the sections describing her interviews with law enforcement.

[3] This timestamp is based on the earliest time-stamped CCTV footage the government was able to successfully cross-reference to the open source footage depicting Hodges; it is possible Hodges was present on Capitol Grounds before this.



*Image 1: Sandra Lee Hodges (circled yellow) on January 6, 2021, standing near the front line as MPD officers wrestled with rioters*

Hodges stood near the front line of barricades defended by MPD officers on the Lower West Plaza steps. Hodges joined the crowd's heckling of that police line, yelling "freedom" towards the officers. *See* Image 2, Sentencing Exhibit ("Sent'g Ex.") 1 at 0:16. She also watched rioters wrestle with police over barricades, and saw police deploy chemical irritants into the crowd in an attempt to disperse them. *See* Images 1, 3, Sent'g Ex. 2 at 0:01.



*Image 2: Hodges (circled yellow) yells "Freedom" towards the line of officers (off-camera right)*



*Image 3: Hodges (circled yellow) watches rioters wrestle over barricades with police*

At approximately 2:30 p.m., the final police line on the West Plaza collapsed due to the sustained assaults by rioters. Officers would ultimately pull back to the Lower West Terrace Tunnel to regroup. Hodges—now without glasses and holding her red Trump hat—remained in

the West Plaza.  *See* Image 4; SOO ¶ 11.  At some point during her time on the West Front, Hodges

dropped her hotel keycard, which USCP recovered days later during cleanup efforts.



*Image 4: Hodges (circled yellow) remained in the West Plaza after the police line collapsed*

Hodges soon proceeded up to the Upper West Terrace.  SOO ¶ 12.  There, officers in riot

gear were gathered in an attempt to clear the area of rioters.  Hodges saw but was undeterred by

their presence, instead joining the mob's chant of "USA" and soon heading into the U.S. Capitol

Building.



*Image 5: Hodges (circled yellow) chanted "USA" as officers (circled blue) gathered to clear the Upper West Terrace*

At 2:53 p.m., Hodges entered the Capitol Building through the Senate Wing Door, which had been breached for the second time that day only five minutes earlier. *See* Image 6; SOO ¶ 13. At that time, rioters were entering and leaving the building through broken windows on either side of the door, and an alarm was ringing. *Id.*



*Image 6: Hodges (circled yellow) entered the U.S. Capitol Building at 2:53 p.m.*

By approximately 3:07 p.m., Hodges had entered the hideaway office of a United States Senator, which is located immediately down the hall to the south of the Senate Wing door. *See generally* SOO ¶¶ 14–15. Hodges sat on a couch and unpacked the contents of her backpack, including the red hat she had been previously wearing and can of Coca-Cola. *See* Image 7. While Hodges was in the office, another rioter picked up a phone in the office and said loudly, "Hello, U.S. Senate, we have a fraudulent election I would like to report. Yeah, we need to get our boy Donald J. Trump in office . . . ." After another rioter yelled, "Get Pence on the phone!", the first rioter responded, "Yeah, get Mike Pence on the phone." Hodges heard this conversation.



*Image 7: Hodges (circled) in the U.S. Senator's Office unpacking the contents of her backpack*

At 3:13 p.m., Hodges (now wearing her red hat and holding the Coca-Cola can) entered S-145, a conference room down the hall south of the Senate Wing Door and near the U.S. Senator's office. *See generally* SOO ¶ 16. S-145 was ordinarily used for visiting spouses of U.S. Senators. Hodges banged her fist on a table in S-145 as the crowd chanted, "America First." *See* Image 8; Sent'g Ex. 3 at 0:20. After another rioter warned others not to break anything, Hodges stated to him, "I'm not breaking anything. This is our house." *See* Image 9; Sent'g Ex. 3 at 1:44.



*Image 8: As the crowd chanted, Hodges (circled) banged her fist on the conference room table in S-145*



*Image 9: Hodges stated, "I'm not breaking anything.  This is our House."*

Hodges then proceeded to the Crypt, an area further south of the Senate Wing Door in the

center of the Capitol Building, entering at approximately 3:17 p.m.  SOO ¶ 17.  While in the Crypt,

Hodges joined the mob's call-and-response of "Whose House? Our House!"  *See* Image 10; Sent'g Ex. 4.



*Image 10: Hodges (circled) joined chants in the Crypt*

Hodges remained in the Crypt for approximately 15 minutes.  At approximately 3:32 p.m., law enforcement officers, who were attempting to reassert control of the Capitol, directed rioters in the Crypt, including Hodges, out of the building.  *See* Image 11.  Hodges exited the Capitol through the Memorial Door at approximately 3:33 p.m.  *See* Image 12.  In total, Hodges spent approximately 40 minutes inside the U.S. Capitol Building.  *See* SOO ¶ 18.



*Image 11: Hodges (circled) is directed out of the building by officers at approximately 3:32 p.m.*



*Image 12: Hodges (circled) left through the Memorial Door at approximately 3:33 p.m.*

After she left, Hodges remained for a time on the East Steps of the Capitol, where she appears to have taken selfies with other rioters on her phone. *See, e.g.,* Image 13.



*Image 13: One of several "selfie" photos obtained by court-ordered search warrant from Hodges' phone that appears to depict Hodges on the East Steps[4]*

*Defendant's Pre-Arrest Interview*

Agents of the FBI interviewed Hodges at her home on April 6, 2023.  Hodges said that she met a female friend online in the days leading up to January 6, 2021, and picked up that friend in Virginia Beach, Virginia on her drive to D.C.  According to Hodges, the friend also stayed with her at the Mandarin Oriental in a room under Hodges' name.  However, incredibly, Hodges claimed to not remember this woman's name.

Hodges said that she intended to attend former President Trump's speech on January 6, 2021.  According to Hodges, however, she woke up late on January 6, 2021 and by the time she left her hotel, she encountered a large group of people who told her they were going to the U.S. Capitol Building to protest.  Hodges claimed that she then was swallowed by the crowd, walked with them to the U.S. Capitol building, and was "sucked into the building."  Needless to say, Hodges' claim that she was sucked into the building is demonstrably false.

---

[4] While the photograph's contents suggests that Hodges took this photo soon after she left the Capitol, the metadata from the photo itself is inaccurate.

Hodges admitted to entering two separate rooms inside the Capitol and identified herself in photos.  However, she claimed that in one of the two rooms, a man came in and started banging on the table and ripped something off the wall.  Hodges said she believed this individual was affiliated with Antifa and that something was not right, so she decided to leave with the help of the police who were ushering people out of the building.  However, the evidence shows that Hodges was one of the individuals banging on the table in S-145.  Contrary to her statement, Hodges also did not leave the building after her time in S-145—instead, she went to the Crypt and joined additional chants, remaining in the building another 15 minutes before police escorted her out.



*Defendant's Post-Arrest Interview*

On February 1, 2024, the FBI arrested Hodges and executed a Rule 41 search warrant at her home.  When Hodges was advised that the warrant included the blue jacket and red baseball hat she wore on January 6, 2021, Hodges told agents that she got rid of them after she spoke with agents in April 2023 because she knew the FBI would probably want them at some point.  Hodges also stated that she still could not recall the name of the friend she picked up in Virginia en route to D.C., but added, "she's crazy."

*The Charges and Plea Agreement*

On March 27, 2024, the United States charged Hodges by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  On May 13, 2024, pursuant to a plea agreement, Hodges pleaded guilty to Counts Three and Four of the Information, charging her with violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, the defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Hodges now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000 on each count.  The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of Hodges to 3 months' incarceration on Count Three and 36 months' probation on Count Four.  The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Hodges' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Hodges, the absence of violent or destructive acts is not a mitigating factor.  Had Hodges engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Hodges' case is her decision to spend 40 minutes inside the Capitol Building despite the chaos and melee she saw beforehand.  For more than twenty minutes on the West Front, Hodges was within feet of violent altercations between rioters and police.  Despite seeing police deploy chemical agents at rioters, Hodges did not leave—instead, she joined chants.  Hodges saw the police line collapse on the West Front, and she saw officers on the Upper West Terrace trying to reimpose order.  And yet, Hodges made the incredible decision to enter the Capitol Building through the breached Senate Wing Door, despite rioters climbing through windows and an alarm blaring.  She entered *two* sensitive spaces, joining an "America First" chant and justifying her presence in "our house."  Then—Coca-Cola in hand—she joined more chants in the Crypt until police finally escorted her out of the Building.  When she was confronted with evidence of her crimes, not only did Hodges lie about key aspects of her conduct to the FBI, but she also destroyed incriminating evidence—her hat and jacket—because she knew the FBI would come looking for it.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of significant incarceration in this matter.

### B.  Hodges' History and Characteristics

Hodges has no criminal history, had a productive work history in clinical research before her retirement, and served in the Air Force and Reserves for 11 years until her honorable discharge. PSR ¶¶ 35 –39, 62–64, 69–75.  This history gives no reason to explain Hodges' conduct on January 6, 2021.



Accordingly, Hodges' history and characteristics indicate that a sentence of incarceration is necessary. ████████████████████████████████████████

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

While Hodges has accepted responsibility through her guilty plea, her post-January conduct and statements demonstrate a lack of remorse and candor.  Hodges told brazen, obvious

lies to the FBI during her first interview in service of a narrative, pointing blame at the crowd that sucked her in, Antifa, her medical condition—anywhere but at her choices.  It is also highly improbable that Hodges does not know who she picked up and stayed with on January 5, 2021. After the FBI came knocking, Hodges then disposed of her clothing *because* she knew the FBI would want it.  Her obstruction of justice shows a flagrant disregard for the rule of law.  *Compare* U.S.S.G. § 3C1.1 app. n. 4(D) ("destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so").  Given this post-January 6 conduct, the Court should view the remorse Hodges has expressed to date and may at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

    With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Hodges in a manner sufficient to deter her specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

    As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers.[5] This Court must sentence Hodges based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Hodges has pleaded guilty to Counts Three and Four of the Information, charging her with Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Deborah Sandoval also entered the Capitol through the Senate Wing Door, yelled loudly for Nancy Pelosi, and paraded in the Capitol for 25 minutes—including in the hideaway office Hodges entered. *United States v. Deborah Sandoval*, 21-CR-195 (CKK) (D.D.C.). Unlike

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Hodges, Sandoval encouraged her sons to attend and discussed bringing weapons to D.C. in advance of January 6.  Sandoval also later used social media to glorify the events of the day, and deleted evidence from her phone after she learned other rioters faced criminal prosecution for their involvement.  This Court sentenced Sandoval on her plea to 18 U.S.C. § 1752(a)(1) to 5 months incarceration, 12 months supervised release, and $500 restitution.  While Hodges did not engage in the same pre-planning for violence or glorification after the fact, Hodges spent significant time on the West Front during violent scrums, spent longer inside the Building, entered two sensitive spaces, and destroyed evidence after the FBI came to her house *because* she knew they would want it.  A slightly less—but still significant—sentence of incarceration is appropriate.

Marilyn Fassell also entered the Capitol through the Senate Wing Door, entered Speaker Pelosi's office and the same Senator's hideaway office as Hodges, and spent the same amount of time (40 minutes).  *United States v. Marilyn Fassell*, 21-cr-692 (CKK) (D.D.C.).  In addition, Fassell overcame her husband's reluctance to entering the building, encouraged other rioters to breach the Capitol, smoked a cigarette while inside (compare to Hodges' can of Coke), and gave a post-arrest interview downplaying her culpability.  This Court sentenced Fassell to 30 days incarceration, 36 months probation, and $500 restitution on her plea to 40 U.S.C. § 5104(e)(2)(G). Unlike Fassell, however, Hodges' entry followed her time in the middle of the melee on the West Front, ignoring the violence around her and even heckling officers by chanting "Freedom!" Hodges also engaged in obstruction of justice—both by lying about key aspects of her conduct (including the incredulous statement that she did know her friend's name) and by destroying her material evidence, *i.e.* her clothing.  Accordingly, a more significant sentence for Hodges is appropriate.

Similarly, Oliver Sarko entered the same two sensitive spaces as Hodges. *United States v. Oliver Sarko*, 21-CR-591 (CKK) (D.D.C). Sarko recorded himself making threats such as "Where are the traitors" and "Bring out Pelosi!" outside of the Capitol and posted them on Snapchat, watched violently rioters breach the Capitol, and had a criminal record. This Court sentenced Sarko to 30 days incarceration, 36 months' probation, and $500 restitution on his plea to 40 U.S.C. § 5104(e)(2)(G). However, Hodges' conduct is arguably worse than Sarko's—she stood near the police line on the West Front during moments of extreme violence for almost 20 minutes; was in the Capitol for longer (40 minutes versus Sarko's 20); and after January 6 both flagrantly lied to the FBI and deleted evidence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hodges must pay $500 in restitution, which reflects in part the role Hodges played in the riot on January 6.[7] Plea Agreement ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Hodges' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 105.

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.    Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and (G) subject her to a statutory maximum fine of $5,000 on each count. *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has not shown an inability to pay, thus the Court may consider imposing a fine in addition to restitution.   PSR ¶ 86.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 3 months' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Hodges' liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

24

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
New York Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
Michael.Barclay@usdoj.gov
(202) 252-7669