IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

SANDRA LEE HODGES

No. 24-CR-152 (CKK)

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Sandra Lee Hodges, by and through counsel, respectfully submits this sentencing memorandum in support of her request for a reasonable sentence. Ms. Hodges maintains that this case warrants a non-incarceration sentence based on the many mitigating factors in this case, including her personal history and characteristics, the nature and circumstances of her offense, and the need to avoid unwarranted sentencing disparities. These factors suggest that a non-incarceration sentence is appropriate and will accomplish the statutory factors set forth in 18 U.S.C. § 3553(a).

### Statement of Relevant Facts

Sandra Hodges drove to Washington, DC on January 5, 2021, planning to see President Donald Trump's speech scheduled the next day. Having suffered from ███████████████ for several years, Ms. Hodges was tired when she arrived at the capital city and overslept the next morning. By the time she left her hotel, she realized she had missed the speech but saw a crowd of the president's supporters marching, and wanting to participate in a peaceful protest, she followed them to the United States Capitol Building. She arrived as the crowd forced its way into the building, and she regrets following that crowd inside. Although she did not damage property or injure others, Ms. Hodges understands that she should not have entered the Capitol Building as she did that day. However, a review of her case reveals that her conduct does not merit an active sentence.

1

Ms. Hodges was born in Meridan, Connecticut, where she grew up with both her parents and was the oldest of four siblings. Her mother was 17 years old when she had Ms. Hodges, who went to live with her grandmother for a few years when she was a toddler. Ms. Hodges returned to live with her parents and brother Billy when she was around 5 years old. She noted her father was frequently in trouble with the law and was often absent to serve time in jails or prisons for such crimes as writing bad checks. Her brother, Billy, was developmentally delayed and sent to a home for children with disabilities for some time.

Ms. Hodges' mother struggled to care for the family, especially when their father was incarcerated. Both her parents drank, and Ms. Hodges believes her mother suffered from alcoholism and mental illness. Combined, these conditions left her mother incapable of being emotionally present for her children and led her to spend money recklessly. When her father was home, Ms. Hodges witnessed her parents' fighting. She recalled, "they would go after each other," but her mother was more likely to act out physically, especially when she was drinking. As do many children in alcoholic homes, Ms. Hodges became an emotional barometer within her family. She monitored her parents' moods so she could preemptively intervene and try to avoid a violent interaction once tensions began rising. "I was always trying to calm things down and maintain some semblance of peace in the home." At times her parents became so violent Ms. Hodges would call the police for help.

Ms. Hodges managed her parents' issues while also caring for her two younger brothers and sister, and she often assumed adult responsibilities in the home. With their father in and out of custody, the family had no stable income, lived on public assistance, and often had no food, clean clothes, or proper parental supervision. Ms. Hodges remembers going to the store and shopping for the family. She wanted to provide some consistency for her siblings. While Ms. Hodges helped to care for her younger siblings, she felt particularly responsible for her mother. After her parents fought, Ms. Hodges' mother would leave and take Ms. Hodges with her. Ms. Hodges recalls wanting to go with her mother to make sure she would be alright. Unfortunately, her siblings viewed this pattern as their mother favoring her eldest child, which drove a wedge of resentment between Ms. Hodges and her siblings they never truly overcame.

While Ms. Hodges always sought to ensure her mother's safety, her mother did little to protect her own children. They lived in poverty and moved multiple times during Ms. Hodges' upbringing, further contributing to instability that marked her childhood. Given the issues her parents had in caring for their children, Social Services intervened. Ms. Hodges went into foster care twice during her childhood and sometimes stayed with family. While her mother was "drying out" at a mental health facility, Ms. Hodges was sent to stay with an aunt when she was 8 years old. ██████████████████████████████████ ████████████████████████████████████████. When Ms. Hodges told her mother about the first instance, her mother sank into depression and attempted suicide. Ms. Hodges vividly recalls riding in an ambulance while EMTs worked on her mother and feeling guilty for having burdened her mother with the knowledge. It was years later when Ms. Hodges shared with her mother ████████████ ██████████████████████ than engage in self-harm as she had previously, her mother became enraged with Ms. Hodges, throwing her out of the house. Worried about her mother being alone in the house, Ms. Hodges called the fire department to check on her.

The most egregious example of her mother's inability to protect her was when she brought a 15-year-old Ms. Hodges to a bar. Her mother was dating the owner and even allowed Ms. Hodges to drink some alcohol. When Ms. Hodges became tired, she was sent upstairs to the owner's apartment. Someone came up the back stairs and knocked. Thinking it was her mother, Ms. Hodges opened the door. ████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ They never reported the incident to the police or had Ms. Hodges medically examined, and she suspects her mother was afraid of getting in trouble for bringing her underaged daughter to a bar.

The constant moving around and problems in the home also negatively impacted Ms. Hodges academically. Ms. Hodges was a bright child and placed in programs for underprivileged gifted children in middle school. However, with all the moving and missing school, she fell behind in high school. Ms. Hodges' dream was to become a nurse, and she wanted to attend the school near her home. Her academic counselors

warned her that if she stayed at home, she might never complete college, as her mother would continue to draw her back into family drama. Understanding she needed to leave her toxic family environment and knowing she would have to support herself, Ms. Hodges left school during her sophomore year to enlist in the military. Given her young age, Ms. Hodges needed her mother's permission to enlist and was surprised her mother agreed to sign the paperwork. She earned her GED during the enlistment process and entered the United States Air Force in February 1980.

Having never received real support and positive feedback from her family, Ms. Hodges was surprised upon achieving a high score on the Armed Services Vocational Aptitude Battery (ASVAB) test required for all new recruits. This opened opportunities for her within the Air Force, and she took a job as an administrative specialist, which required her to become familiar with military policies, maintain paperwork, update records, and write letters for the commander. She also handled personnel issues for her unit. When she started in the Air force, she completed 6 weeks of boot camp at Lackland Air Force Base (AFB) in Texas. Despite enduring some name calling, Ms. Hodges made friends and felt she started to come out of her shell.

Ms. Howell was next stationed at Keesler AFB in Biloxi, Mississippi for 8 weeks, during which she trained for the administrative specialist position and made more friends. She stayed there and was assigned to a communications squadron. It was during this time Ms. Hodges met her husband, Randy Hodges. The two knew each other just a few months before Randy was assigned to a base in England, and they decided to get married. Looking back, Ms. Hodges knows Randy had issues. ████████████████████████████ ████████████ which made her uncomfortable, but he was the first man to ever say he loved her. So, Ms. Hodges overlooked his faults, and the couple was married by the end of 1980, which allowed them to be stationed together in England.

Ms. Hodges and her husband arrived in England in January 1981. Outside her time on Air Force bases, Ms. Hodges had never traveled beyond Connecticut. She recalls arriving there and it feeling like "landing on Mars." She and her husband were stationed at a royal air force base staffed with English civilian employees. Ms. Hodges fondly looks back on her time stationed in the UK. She came to love the base and made friends

4

she stayed in touch with for many years. While there, Ms. Hodges was assigned to a civil engineering squadron as an administrative specialist and recalls her unit decoding messages during the Cold War. During that assignment, Ms. Hodges had her son, Allen.

In 1985, Ms. Hodges and her family returned to the United States and were stationed at Nellis Airforce Base in Nevada. She recalls receiving numerous awards and commendations during her time there, and she was promoted to one of the highest posts on the base. She was highly respected within the Air Force as was given a special duty assignment to work with the commanding general and chief master sergeant. However, Ms. Hodges still dreamed of attending nursing school. So, while stationed in Nevada, she attended college part-time at the University of Nevada and maintained a 4.0 average while working full-time with the Air Force and raising her son.

In 1988, Ms. Hodges transitioned from active service to the Air National Guard. She completed a 6-month training as a medic reservist, which aligned with her long-term goal of entering the nursing profession. She went to Sheppard AFB in Texas for part of the training and completed her clinical training at Davis-Montham AFB in Tucson, Arizona. When she returned to Nellis AFB, she had weekend assignments and began working with an airline as a receptionist as her day job. Ms. Hodges served as a gate receptionist and ticket agent at what is now Harry Reid International Airport. This allowed her to attend classes more regularly as she worked toward her nursing degree.

In 199l, both Ms. Hodges and her husband were called to active duty for Operation Desert Storm. As her husband prepared to deploy, Ms. Hodges took their son to her in laws in Mississippi. She then returned to Nevada to prepare for her assignment before flying to Seymour Johnson AFB in North Carolina where Ms. Hodges was assigned to work as an emergency room medic. She cared for service men and women who had been experimented on with nerve gas agents and showed the first stages of "Gulf War Syndrome."[1] Although

---

[1] According to HopkinsMedicine.org, "Gulf War syndrome is a widely used term to refer to the unexplained illnesses occurring in veterans of the 1991 Gulf War." It includes such symptoms as fatigue, musculoskeletal pain, cognitive problems, skin rashes, and diarrhea. *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/gulf-war-syndrome (last visited October 3, 2024).

she never deployed, Ms. Hodges recalls the 8 months she was stationed in North Carolina as "anxiety-provoking" as she never knew whether she was going to be deployed. Once her unit returned, she was sent back to Nevada.

Ms. Hodges and her husband picked up her son and returned to Nevada. After months of being separated from her son and experiencing constant uncertainty about whether she would deploy Ms. Hodges took the opportunity to request an early release from her national guard contract. She did not want her son to face the possibility of two parents being deployed at the same time. While her husband remained enlisted in the Air Force, Ms. Hodges separated from the military in the summer of 1991. She received an honorable discharge and earned numerous awards and commendations including an Air Force Training Ribbon, Air Force Longevity Service Award Ribbon, Air Force Good Conduct Medal, Air Force Commendation Medal, Air Force Achievement Medal, Noncommissioned Officer Professional Military Education Graduation Ribbon, and Air Force Overseas Long Tour Ribbon. For the remainder of her time in Nevada, Ms. Hodges worked at the airport and took classes, completing liberal arts classes and some prerequisites for a future nursing degree.

In 1993, Ms. Hodges' husband volunteered to be stationed at Naval Station Great Lakes in Chicago, Illinois. This was a special duty assignment her husband took without first letting her know. Ms. Hodges described a difficult transition to this new base. Chicago was very different from Las Vegas. It took her out of a place she was familiar and took her son, Allen, away from his school and his friends. While Ms. Hodges found a new job and enlisted in classes at the College of Lake County, Allen struggled to fit in at his new school. He had trouble making friends, felt like an outsider, and became "a loner, recoiling into himself." Ms. Hodges' new job in Illinois was with the Gurnee Police Department, where she worked as a transcriptionist. She recalls excelling at this job as she had done in her prior workplace, earning awards for her efforts.

By 1995, Ms. Hodges earned an associate degree in applied sciences to become a registered nurse (RN). She became a licensed RN that same year. Ms. Hodges was happy to have achieved her life-long goal of becoming a nurse. Unable to find work in her field, she worked for America Trans Air, booking reservations for several months before she was contacted about clinical research coordinating. Although she had envisioned

herself working in a more traditional nursing environment, Ms. Hodges accepted the position with Lake Bluff Medical Associates, which was close to her husband's base. There, doctors conducted clinical trials for pharmaceuticals, and Ms. Hodges used her nursing skills by administering medications, drawing blood, and conducting EKGs. She worked there for two years before her husband was reassigned to Beale AFB in Northern California.

As with their move to Chicago, moving to California required completely uprooting her family. Ms. Hodges went ahead to set up their home, but she struggled to find work. She was a new nurse with no solid nursing experience. Fortunately, one of her pharmacy reps from her old job recommended her for a clinical research position with Smith Klein Beecham. Ms. Hodges managed sites through northern and southern California, while locating new research sites to conduct research for their products. Once she identified a site, Ms. Hodges would stay to supervise the clinical research associates. It was during that time Ms. Hodges became familiar with the standard operating procedures (SOPs) for clinical research trials. She developed an expertise on those procedures as well as FDA guidelines. Over the next 15 years, Ms. Hodges became a trainer on SOPs and rose within the ranks of her company, which eventually was renamed GlaxoSmithKline.

As Ms. Hodges' responsibilities within her company grew, so did the territory she oversaw. Eventually, she began flying around the country to train and supervise other sites. She asked to be reassigned to Utah so she could live in a city with an airport hub providing direct flights to her work destinations. Ms. Hodges became a primary wage earner within her home, but with her continued success, she found that her husband became more distant and envious of her successful career. Ms. Hodges was working long hours and traveling, and her husband moved into their guest room, claiming that her getting ready to catch early morning flights was interfering with his sleep. After her husband retired from the Air Force, Ms. Hodges invited him to join her on her trips. He went a few times a first, but eventually she noted he did not enjoy accompanying her, as she always had to work.

Ms. Hodges began noticing Randy distancing himself from her as early as their time in California. He seemed to look for excuses to stay out of the house, at times claiming he would be grocery shopping while

7

other times saying he was trying out instruments at guitar stores. When she was home, Ms. Hodges found that Randy began drinking more frequently. He bought big bottles of whiskey and drank so much his words were slurred and food would fall out of his mouth. Randy also became irritable and unkind toward Ms. Hodges, making fun of her and her work. This emotional abuse continued for several years and "it took a toll on me and destroyed my self-concept of who I was." The confidence she felt after attaining her nursing degree eroded. When they attended church on Sundays, Randy sneered at her attire, telling her she dressed "like a schoolmarm." After he retired, he resentfully commented, "I'm just your kitchen bitch."

Feeling she needed to "fix" the situation and help her husband regain his confidence, Ms. Hodges encouraged him to apply for a job teaching health care technology at a community college. Her husband did not have the required bachelor's degree, but Ms. Hodges encouraged him to try for the job anyway as he had solid healthcare experience from his time in service. She recalls being an encouraging person, noting she always wished she had a cheerleader and that drove her to become a cheerleader for her loved ones. Although her husband got the job, this did little to help their relationship. Complicating matters was the ███████ ███████████████ Ms. Hodges began to experience around the same time her marriage began unraveling.

Ms. Hodges left GlaxoSmithKline in 2005, to work for MDS Pharma Services and Eli Lilly before landing at GE Healthcare as a Senior Clinical Research Associate in 2007. However, her clinical research career came to a close shortly after ████████████████████████████ ████████████████████████████████ were more than simply being overworked and emotionally exhausted from her failing marriage. Ms. Hodges initially approached her diagnosis with skepticism and denial. As a medical researcher, ████████████████████████████████ ██████████████████████████████. Moreover, she resented her doctor's advice to slow down her work schedule and scale back on the travel that contributed to her constant fatigue. By April 2008, Ms. Hodges' body and mind were failing. Her marriage was in terrible shape, and she was physically unable to work. When she struggled to concentrate and suffered short-term memory loss, Ms. Hodges took an early retirement for medical reasons.

A few months later, ███████████████████████████████████████████████
She called 911, and the police came to check on them. The morning after, Ms. Hodges told her husband she was worried about him and wanted to discuss what had happened. Randy was angry and told her he did not love her anymore. "We had been married almost 28 years, and I said I was willing to go to counseling so they could fix the situation, but he said he didn't want to work on our marriage." In August 2008, Ms. Hodges learned ██████████████████████████████████████████████████████. Ms. Hodges fell into a deep and dangerous depression, and by the fall of 2008, ████████████████ ██████████████████████████████ Ms. Hodges recalls feeling so dejected and angry about her situation, she turned away from God.

After her divorce was finalized in November 2008, Ms. Hodges moved to Florida, where her cousin lived. She recalls this time as "a dead time for me" as "I wasn't making any friends and I wasn't trusting anyone." Over time, Ms. Hodges regained her faith in God and began attending church regularly. Ms. Hodges son, meanwhile, was living in Idaho. He had gotten a divorce and was in a new marriage that was having trouble. In 2014, she moved to Idaho to be close to him and the children of his new wife, whom he was helping raise. Ms. Hodges lived in the same apartment complex as her son, but she realized that she was becoming too involved in her son's family life. Knowing that when she "tries to fix people, they get frustrated with" her, Ms. Hodges decided to move away from Idaho to give her son and his family space. Having enjoyed North Carolina when she was stationed there during the Gulf War, Ms. Hodges relocated to Hertford, North Carolina in 2017, where she currently lives by herself.

Since moving to North Carolina, Ms. Hodges has joined a church but admits she has few friends. Her ████ left her with little energy for activities out of her home, so she began spending more time on the internet and watching current events media. After Donald Trump became president, Ms. Hodges found herself drawn to his supporters, who shared her values and her fears about the country's losing those values. After the 2020 election results, Ms. Hodges consumed media that claimed something had gone wrong with the vote. She continued to follow media posts about the election and learned the outgoing president was set to deliver a

9

speech the day the votes were to be certified by lawmakers in the nation's capital on January 6, 2021. Wanting to hear him speak, Ms. Hodges decided to travel to Washington, DC to attend the speech. However, when she woke up late the next day and learned she missed hearing the speech, Ms. Hodges followed people who stated they were going to protest the vote. She walked with them to the U.S. Capitol Building and followed them inside, where she was seen sitting on a couch in a senator's office drinking a soft drink, banging on a conference table, and walking through the building until she was ushered out about 40 minutes after she entered.

Since January 6, 2021, Ms. Hodges has had ample time to consider her conduct that day. When she was first confronted by FBI agents in the spring of 2022, she was understandably frightened. Agents returned a year later, and she was arrested for charges related to her participating in what took place two years earlier. Ms. Hodges has reviewed the discovery in this case and was shocked at the video footage of her activities in the Capitol Building. Before viewing these materials, she had a very hazy memory of what had taken place that day. But the video discovery revealed a person she finds incongruous with the person she knew herself to be.

While working through this case, Ms. Hodges has confronted issues surrounding her identity. She has discovered that "my identity was necessary to protect me from my past trauma." Ms. Hodges has embraced many identities throughout her life including being a person in control, an expert in her field, a teacher relied upon for her advice and knowledge, and a leader. She has also been a caring daughter, a responsible sister, an encouraging wife and mother, and a good Christian and citizen. Ms. Hodges knows she clings to her identity as a lifeline. She has since identified times when her identity has been threatened and how that has affected her. Her personal identity was threatened by her divorce. Her professional identity was threatened by her chronic illness. And today, her identity as a good person and citizen has been threatened by her actions on January 6, 2021.

Given her mental health and trauma history, 

████████████████████████████████████████████████████████ █ ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ █ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ █

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ █ ██████████████████████████████████████████ █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ █ ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ █ ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ █

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[12] *Id.* at 9.
[13] *Id.*
[14] *Id.*
[15] *Id.* at 10.
[16] *Id.*
[17] *Id.* at 11.
[18] *Id.*
[19] *Id.*

███████████████████████████████████████████████████████

████████████████████████████ █ ████████████████████████████

███████████████████████████████████████████████████████

Ms. Hodges does not downplay the significance of what took place in the U.S. Capitol Building on January 6, 2021. She understands that, in addition to the extensive and costly property damage the building sustained, people were hurt. From the legislators who were made to hide from the mob to those who lost their lives, Ms. Hodges knows what happened that day was serious and costly, and that merely being part of such a crowd emboldens some of its members to engage in dangerous behaviors. Although she did not destroy property or injure others, Ms. Hodges knows she should not have entered the Capitol Building, and she regrets any contribution her presence there may have had on others' decisions to engage in damaging conduct as well as the impact it had on the counting of the votes that day.

Ms. Hodges viewed the footage of her behavior and is ashamed of the angry woman depicted in the videos and images taken that day. Ms. Hodges is not only ashamed of her conduct, but she also feels the stigma of having been involved in that situation. Since her charges were made public, Ms. Hodges has been turned away from volunteer opportunities within her church and neighborhood and knows that her conduct has affected how people in her community view her. As such, Ms. Hodges knows she will never again become involved in such behavior. She wishes to restore her identity as the good person and citizen she has always been. With all the trauma she has experienced in her life, Ms. Hodges sees that her time is better spent addressing her past and seeking treatment for her mental health issues. She hopes for the opportunity to remain out of custody so that she can focus on her health and restoring her reputation.

### Argument

According to 18 U.S.C. § 3553(a), a sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the statute and must consider several factors

---

[20] *Id*. at 12.
[21] *Id*.

in determining the sentence imposed. Among those factors are the history and characteristics of the defendant, the nature and circumstances of the offense, the need to afford deterrence and protect the public, and the need to avoid unwarranted sentencing disparities. Ms. Hodges maintains that the § 3553(a) factors, when applied to her case, weigh in favor of a non-incarceration sentence.

### 1. Ms. Hodges's history and characteristics support a non-incarceration sentence.

Ms. Hodges was raised in a lower middle-class home in Connecticut. She had a turbulent childhood and grew up in a family negatively affected by the disease of alcoholism. Witnessing the effects alcohol had on her family members, Ms. Hodges has steered clear of drinking and substances. Until her arrest for this case, she has never had contact with the criminal justice system and has no criminal history (PSR ¶¶ 35-39). Ms. Hodges also knows that she needs support and counseling to address the issues that left her vulnerable to participating in the events at the U.S. Capitol Building that day. She acknowledges it was easier to focus on the nation's problems than her own, but she is willing to do the hard work of facing her past trauma and getting help for her anxiety and depression. She knows that shifting that focus to herself will ensure she does not become involved in future similar conduct.

Moreover, Ms. Hodges' medical conditions further support her serving a sentence outside of a carceral setting. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ █ ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[22] Ex. 1 at 13.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████ and she experiences

more symptoms today than she did in January 2021. Individuals such as Ms. Hodges are better treated for these

conditions in the community rather than in a carceral setting.

Additionally, from the complex trauma of her childhood and later traumas she experienced during her

divorce and ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████ █ ██████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████ █ ██████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████ █ ████

█████████████████████████████████████████████████████████

██████     Moreover, Ms. Hodge has expressed her willingness to engage in treatment to address the issue that

contributed to her decision to follow the crowd into the Capitol Building and act out as she did.

---

[23] *Id*. at 2.
[24] *Id*. at 13.
[25] *Id*.

`Aside from her conduct in this case, Ms. Hodges has led a law-biding life, serving honorably in the military, working as a professional in the pharmaceutical industry, and being an active member of her church and community. Her participation in the events on January 6, 2021, not only represents a break from her usual conduct; it signals her need for treatment and positive engagement in her community. A non-incarceration sentence would allow Ms. Hodges to continue demonstrating her respect for the law, as she has done during her time on release conditions. It would also permit her to begin accessing needed services while preventing a lapse of her continued medical care. Her remorse for her actions and lack of criminal conduct since her offense signal that she does not require an active sentence to deter her from future conduct. Accordingly, a non-incarceration sentence is an appropriate outcome for this case.

2. **Ms. Hodges' low risk of recidivism, acceptance of responsibility for her conduct, and personal deterrence from future criminal conduct further support a non-incarceration sentence.**

One of the many factors favoring a non-incarceration sentence in this case are the lack of criminal history and the low statistical probability of recidivism for individuals such as Sandra Hodges. Ms. Hodges has no criminal history. According to empirical research by the U.S. Sentencing Commission, individuals like Ms. Hodges, with no prior convictions or arrests, have the lowest rate of recidivism.[26] More importantly, there is no indication that Ms. Hodges engaged in any similar conduct prior to entering the Capitol Building on January 6, 2021. Ms. Hodges's background also predicts a lower rate of recidivism compared to others in her

---

[26] *See U.S. Sentencing Commission, Recidivism and the "First Offender,"* at 14 (May 2004), found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf. (last visited Jan.11, 2023) This study found the lowest rate of recidivism at 6.8% for defendants with no prior arrests nor criminal history, compared at 8.8% for those with prior convictions that do not count toward criminal history points.

position given her level of education,[27] age,[28] gender,[29] and lack of substance abuse.[30] This is further supported by  Finally, Ms. Hodges' deteriorating health condition, ███████████████████, further suggests she will not recidivate. Her low risk of recidivism supports a non-incarceration sentence.

Another factor favoring a non-incarceration sentence in this case is Ms. Hodges's acceptance of responsibility for her conduct. On May 13, 2024, Ms. Hodges pled guilty to Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). In doing so, Ms. Hodges saved both the United States and this Court the time and resources that would have been spent on a trial. Ms. Hodges understands that, although she caused no direct property damage or injuries to others, her very presence in the crowd contributed to what took place in the Capitol Building that day. Moreover, she greatly regrets and is deeply ashamed of the behavior she exhibited, including pounding on a table and screaming with other protesters. Accordingly, as part of her plea agreement, Ms. Hodges agreed to pay restitution in this case. Ms. Hodges further demonstrated her acceptance of responsibility by complying with conditions of release set by this Court. Her good conduct while on release demonstrates Ms. Hodges's respect for court orders and the ability to comply with release conditions. This compliance predicts continued good behavior should she be given a non-incarceration sentence with supervision.

---

[27] Offenders with college degrees (8.8%) are less likely to recidivate than those who have some college education (18%), just a high school education (19.3%), or those with less than a high school education (31.4%). *Id.* at 12. *See* U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, May 2004 at 12, http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited Jan. 11, 2023)

[28] Offenders over age 50 have a recidivism rate of 9.5% compared to younger offenders. *See id.* at 12.

[29] Female offenders are less likely to recidivate than their male counterparts, with those in lower CHCs recidivating less than those in higher CHCs. *See id.* at 13.

[30] "Overall, offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%)." *Id.* at 13.

[31] Ex. 1 at 12.

Finally, the collateral consequences of Ms. Hodges's conduct in this case provide added punishment and deterrence that obviate the need for an active sentence. Having pled guilty in this case, Ms. Hodges will now have a misdemeanor conviction on her once clean criminal record. Moreover, given the high-profile nature of the offense conduct, Ms. Hodges' case has been covered by the media and is easily found with an internet search of her name, which further heightens the stigma of this conviction.[32] Because of this, Ms. Hodges has been told her church no longer wishes her help with their youth group program, she has been told the Red Cross blood drive no longer needs her assistance, and others in her church and community have distanced themselves from her. The many collateral consequences of this conduct and conviction therefore provide additional punishment, promote respect for the law, and serve as a deterrent to both Ms. Hodges and the public.

**3.  The nature and circumstances of Ms. Hodges's offense further support a non-incarceration sentence considering the spectrum of conduct that occurred on January 6, 2021.**

The events of January 6, 2021, represent a shocking time for our nation. Angered by the outcome of the 2020 election and encouraged by the outgoing U.S. President to "walk down to the Capitol" and "show strength," a crowd descended upon the U.S. Capitol Building.[33] This crowd pushed past police barricades, forced their way into the building, and delayed Congress from counting electoral votes.[34] Several individuals died that day, including protesters such as Ashli Babbitt (fatally shot while trying to enter the House chamber), Kevin Greeson (heart attack), Rosanne Boyland (reportedly crushed in a stampede), and Benjamin Philips

---

[32] *See* Google.com search for "Sandra Hodges," found at
https://www.google.com/search?q=sandra+hodges&sca_esv=7aa1caabb4121f2c&sca_upv=1&rlz=1C1RXQR_enUS1004US1004&sxsrf=ADLYWIIZM14Pa9jPtMbbRdpzTahxG1cwWg%3A1727708750765&ei=Tr76ZqK8LrnJkPIPi8mQwQU&ved=0ahUKEwiim_XS-OqIAxW5JEQIHYskJFgQ4dUDCA8&uact=5&oq=sandra+hodges&gs_lp=Egxnd3Mtd2l6LXNlcnAiDXNhbmRyYSBob2RnZXMyCxAAGIAEGJECGIoFMgUQABiABDIGEAAYFhgeMgYQABgWGB4yBhAAGBYYHjIGEAAYFhgeMgYQABgWGB4yBhAAGBYYHjIGEAAYFhgeMggQABiABBiiBBiJBUjkCVDpBFjpBHABeACQAQCYAagBoAGoAaoBAzAuMbgBA8gBAPgBAZgCAaCCAaACtwGYAwCIBgGSBwMwLjGgB9AF&sclient=gws-wiz-serp The search results include articles in the Charlotte Observer, "NC nurse arrested in Capitol attack left a clue, feds say. It led to her arrest," (https://www.charlotteobserver.com/news/local/crime/article276351246.html), The Daily Beast " Nurse Nabbed After Leaving Swanky Hotel Key at Capitol Riot, Feds Say," (https://www.cbsnews.com/news/two-active-duty-marines-plead-guilty-jan-6-capitol-riot-charges/), and DOJ.gov (https://www.justice.gov/usao-dc/defendants/hodges-sandra-lee).
[33] *See* Poynter.org article, "A timeline of what Donald Trump said before the Capitol riot," found at
https://www.poynter.org/fact-checking/2021/a-timeline-of-what-donald-trump-said-before-the-capitol-riot/ (last visited September 30, 2024).
[34] *Id*. (Poynter article)

(stroke).[35] One Capitol Police Officer died of a stroke the next day and four others committed suicide.[36] Moreover, the building suffered extensive damage from rioters who broke doors and windows to enter the building. Some of the more egregious acts of property damage included smearing blood on the bust of U.S. President Zachary Taylor[37] and rioters' urinating and defecating in the building.[38] It was reported, "During the riot, Capitol employees raced to save the building's artwork and furnishings, opening vents to let out chemical fumes and saving items like the roughly 203-year-old silver inkstand present at most House sessions, likely the oldest artifact in the House chambers."[39] Several items in the Capitol Building were also stolen or removed that day.[40] All told, the U.S. Justice Department has estimated the total losses suffered from this event at $2,881,360.20.[41]

On January 5, 2021, after learning on social medial that President Trump would be delivering a speech on January 6th, Ms. Hodges traveled to Washington, DC. Not wishing to travel alone, she learned about a rideshare opportunity through the internet and found a person to ride with her who lived in Virginia. Ms. Hodges arrived in D.C. early that evening, and tired from the drive, Ms. Hodges recalls going straight to bed. The next morning, Ms. Hodges realized she had overslept. When she walked out of the hotel, she described feeling like a lost tourist. She saw a people outside and when she asked about the president's speech, they told her she had missed it but that they were going to the U.S. Capitol because "we're going to stand out there and

---

[35] *See* NY Times article, "These Are the People Who Died in Connection With the Capitol Riot," found at https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-deaths.html (last visited September 30, 2024).
[36] *Id*.
[37] *See* NBC.com article, "Capitol reels from damage and destruction left by violent rioters," found at https://www.nbcnews.com/politics/congress/capitol-reels-damage-destruction-left-violent-rioters-n1253383 (last visited September 30, 2024).
[38] *See* New York Post article, " Rioters left feces, urine in hallways and offices during mobbing of US Capitol," found at https://nypost.com/2021/01/08/rioters-left-feces-urine-in-hallways-and-offices-during-mobbing-of-us-capitol/ (last visited September 30, 2024).
[39] *See* Forbes.com article, "Capitol Riot Costs Go Up: Government Estimates $2.73 Million In Property Damage," https://www.forbes.com/sites/zacharysmith/2022/04/08/capitol-riot-costs-go-up-government-estimates-273-million-in-property-damage/?sh=10c5e13119c5 (last visited September 30, 2024).
[40] *See* Forbes article, " Clyburn's iPad, Laptop From Pelosi's Office: Items Stolen, Destroyed In Capitol Attack," https://www.forbes.com/sites/jackbrewster/2021/01/08/clyburns-ipad-laptop-from-pelosis-office-items-stolen-destroyed-in-capitol-attack/?sh=474942295963 (last visited September 30, 2024).
[41] *See* U.S. Department of Justice Report, "30 Months Since the Jan. 6 Attack on the Capitol," found at https://www.justice.gov/usao-dc/31-months-jan-6-attack-capitol (last visited September 30, 2024).

protest." Believing there was a planned peaceful protest and designated gathering spot, Ms. Hodges followed the group. Ms. Hodges acknowledges that she followed the crowd into the building and spent approximately 40 minutes inside. During her time in the building, Ms. Hodges was observed in a senator's office sitting on a couch and drinking a soft drink. She was also seen in a conference room, banging on a table, and yelling while a crowd chanted. She was filmed stating, "I'm not breaking anything. This is our House." Ms. Hodges next was seen in the building's Crypt where she joined others in the crowd chanting, "Whose House? Our house," before law enforcement officers ushered her out of the building through the Memorial Door exit at 3:32PM. All told, Ms. Hodges was in the Capitol Building about 39 minutes.

While Ms. Hodges knows she should not have been in the building that day, her conduct while in the building sits in stark contrast to the more damaging acts that took place by others in the crowd. Ms. Hodges did not break her way into the building; she did not steal, deface, or damage property; and she did not have any altercations with others, including law enforcement officers. In short, Ms. Hodges caused no direct damage or injuries. Moreover, unlike many who publicized the videos and photos they took while in the building,[42] Ms. Hodges did not record or share anything on social media either before or after her time in the Capitol Building. When viewing the events of January 6, 2021, there is clearly a spectrum that ranged from dangerous and violent to more benign forms of conduct. Ms. Hodges's behavior falls on the much less egregious end of this spectrum, which further supports a non-incarceration sentence in his case.

**4.  A non-incarceration sentence is warranted in this case to avoid creating a sentencing disparity among defendants similarly situated to Ms. Hodges.**

District court judges are directed by 18 U.S.C. § 3553(a)(6) to be mindful of "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." As noted above, along the spectrum of January 6th cases, some of which involved defacing historical artifacts and assaulting law enforcement officers, Ms. Hodges's is on the less egregious end. Her

---

[42] *See* e.g., The Guardian article, "Judges weigh social media posts in criminal sentences for US Capitol attack," found at https://www.theguardian.com/us-news/2021/dec/13/judges-weigh-social-media-posts-criminal-sentences-us-capitol-attack (last visited August 21, 2023).

entry into the Capitol Building was not preplanned, and she did not enter the Capitol by scaling up the side of the building or by breaking in windows or doors, but by following behind a larger crowd. Ms. Hodges submits that the 40 U.S.C. § 5104(e)(2)(G) cases discussed below represent appropriate comparable case facts which resulted in no active prison time:

### *United States v. Jordan Kenneth Stotts*, 21-CR-272-TJK (D.D.C.)

Jordan Stotts pleaded guilty to parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Mr. Stotts entered the Capitol around 2:45 p.m. Statement of Offense, 3 [DE-20]. Mr. Stotts walked to the Capitol Rotunda and stayed inside the Capitol Building for around one hour, taking videos with his cellphone. *Id.* at 4. On November 9, 2021, Mr. Stotts was sentenced to 24 months' probation. Judgment as to Jordan Kenneth Stotts [DE- 34].

### *United States v. Caleb Jones*, 21-CR-321-JEB (D.D.C.)

Caleb Jones pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Plea Agreement [DE-18]. Mr. Jones entered the Capitol around 2:20 p.m. Statement of Offense, 3 [DE-19]. Mr. Jones walked down numerous hallways. *Id.* While Mr. Jones was talking pictures and videos while inside the building, he did not post any to social media. Gov't Sentencing Memo., 11 [DE- 23]. On December 1, 2021, Mr. Jones was sentenced to 24 months' probation with 2 months' home confinement. Judgment as to Caleb Jones [DE- 28].

### *United States v. Valerie Ehrke*, 21-CR-97-PLF (D.D.C.)

Valerie Ehrke pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Plea Agreement [DE- 14]. Ms. Ehrke did not plan to enter the Capitol Building on January 6th. Statement of Offense, 4-5 [DE- 15]. After listening to President Trump's speech, Ms. Ehrke entered the Capitol around 2:09 p.m., taking videos while walking through the building. *Id.* at 3. On September 17, 2021, Ms. Ehrke was sentenced to 36 months' probation and 120 hours of community service. Judgment as to Valerie Elaine Ehrke [DE- 26].

By contrast, Ms. Hodges further submits the 40 U.S.C. § 5104(e)(2)(G) cases discussed below as distinguishable cases, which resulted in an active prison sentence:

*United States v. Devin Rossman,* 22-CR-280-BAH (D.D.C.)

Devin Rossman pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Plea Agreement [DE-21]. Unlike Ms. Hodges, Mr. Rossman discussed plans to bring firearms and knives to D.C. before going on January 6, 2021. Statement of Offense, 3 [DE- 22]. Mr. Rossman entered the Capitol Building around 2:19 p.m. and stayed inside the Capitol Building for nearly two hours. *Id.* at 4. While inside the Capitol Building, Mr. Rossman took pictures and sent them to various people through Facebook. *Id.* On December 9, 2022, Mr. Rossman was sentenced to 32 days of intermittent confinement in addition to 36 months' probation. Judgment as to Devin Rossman [DE- 37].

*United States v. Derek Sulenta,* 22-CR-340-TSC (D.D.C.)

Derek Sulenta pleaded guilty to parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Plea Agreement [DE-16]. Unlike Ms. Hodges, Mr. Rossman posted on December 23, 2020, "I'll be there Jan 6th to support the president no matter what happens." Statement of Offense, 3 [DE- 15]. Mr. Sulenta entered the Capitol Building around 2:26 p.m. *Id.* At 4. While in the Capitol Building, Mr. Sulenta posted on Facebook saying, "Dude we breached the capital building," and "Inside the capital building. This is wild!" *Id.* On February 22, 2023, Mr. Sulenta was sentenced to 14 days' imprisonment and 60 hours of community service. Amended Judgment as to Derek Sulenta [DE- 26].

While Ms. Hodges should not have entered the Capitol Building on January 6, 2021, her conduct was not an egregious example of what took place that day. Ms. Hodges did not plan to enter the Capitol Building, she did not enter the Capitol Building by breaking through windows or breaking down doors, and she did not post on social media before or after being in the Capitol Building. Ms. Hodges's conduct was more along the lines of what those who received non-incarceration sentences did rather than of those who received active sentences. Accordingly, a non-incarceration sentence is appropriate for Ms. Hodges, and it would avoid unwarranted sentencing disparities among 40 U.S.C. § 5104(e)(2)(G) defendants.

**Conclusion**

Sandra Lee Hodges is asking this Honorable Court to impose a non-incarceration sentence for her offense on January 6, 2021. Ms. Hodges understands the seriousness of the events that transpired in the Capitol Building and regrets having been with a group that caused the damage and destruction that day. That said, Ms. Hodges's actions while in the Capitol Building and thereafter demonstrate her behavior was on the less egregious end of the spectrum of the conduct that took place that day. Ms. Hodges pled guilty pursuant to a plea agreement with the government, has accepted responsibility for her conduct, and is experiencing the collateral consequences of committing this offense. Moreover, Ms. Hodges is in worse health today than she was in January 2021, ███████████████. She experiences more pain and fatigue, leaving her without the energy or physicality to participate in such conduct. In short, Ms. Hodges has been deterred from this sort of conduct, is unlikely to recidivate, and does not require an active sentence to meet the goals of sentencing in this case.

This Court has the opportunity to recognize Ms. Hodges's excellent military service, acknowledge her low risk of recidivism, untreated trauma, and current health concerns, and impose a sentence that avoids unwarranted sentencing disparities. Therefore, Sandra Hodges respectfully requests this Honorable Court impose a non-incarceration sentence.

Respectfully requested this 10th day of October, 2024.

G. ALAN DUBOIS
Federal Public Defender

**/s/ Diana H.  Pereira**
DIANA H.  PEREIRA
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Diana_Pereira@fd.org
N.C. State Bar No.  32615
LR 57.1 Counsel
Appointed

23

VIDALIA V. PATTERSON
Attorney
N.C. State Bar No. 28017

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was served upon:

MICHAEL LAWRENCE BARCLAY
Assistant United States Attorney
601 D Street NW
Washington, DC 20530

by electronically filing the foregoing with the Clerk of Court on October 10, 2024, using the CM/ECF system which will send notification of such filing to the above.

This the 10th day of October 2024.

/s/ Diana H.  Pereira
DIANA H.  PEREIRA
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Diana_Pereira@fd.org
N.C. State Bar No.  32615
LR 57.1 Counsel
Appointed